**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

RUPERT PERRY,

      Plaintiff,

  v.

NATIONAL CREDIT ADJUSTERS,
LLC, *and* LEE TYLER REMPEL,

      Defendants.

Case No.:

JURY TRIAL DEMANDED

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, Rupert Perry ("**Mr. Perry**"), by and through his attorneys, Seraph Legal, P.A., and complains of the Defendants, National Credit Adjusters, LLC ("**NCA**") and Lee Tyler Rempel ("**Rempel**") (jointly "**Defendants**"), stating as follows:

## PRELIMINARY STATEMENT

1.     This is an action brought by Mr. Perry against the Defendants for violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1961, et. seq. ("**RICO**"), the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, et. seq. ("**FDCPA**"), the Florida Civil Remedies for Criminal Practices Act, Florida Statutes § 772.101, et. seq. ("**CRCPA**"), and the Florida Consumer Collection Practices Act, Florida Statutes § 559.55, et. seq. ("**FCCPA**").

## JURISDICTION AND VENUE

2.      Subject matter jurisdiction for Plaintiff's RICO and FDCPA claims arises under 28 U.S.C. § 1331, as RICO and the FDCPA are federal statutes.

3.      This Court has supplemental jurisdiction for Plaintiff's CRCPA and FCCPA claims under 28 U.S.C. § 1367.

4.      The Defendants are subject to the jurisdiction of this Court pursuant to Section 48.193, Fla. Stat., and Fed. R. Civ. P. 4(k).

5.      Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. §1391(b)(2), because the acts complained of were committed and / or caused by the Defendants within the Middle District of Florida

## PARTIES

6.      Mr. Perry is a natural person who at all times relevant has resided in the City of Palm Coast, Flagler County, Florida.

7.      Mr. Perry is a *Consumer* as defined by the FDCPA, 15 U.S.C. § 1692a(3), and the FCCPA, Fla. Stat. § 559.55(8).

8.      NCA is a Kansas limited liability company with a principal business address of 327 W 4th Street, Hutchinson, Kansas 67501.

9.      NCA is registered to conduct business in the State of Florida, where its registered agent is **Corporation Service Company, 1201 Hays Street, Tallahassee, Florida 32301.**

10.    Rempel is the CEO and manager of NCA.

11.    In his capacity as manager, Rempel is the individual responsible for the determination of, and implementation of, NCA's policies and procedures.

12.    Rempel also participates directly in the day-to-day operations of NCA, including the collection of consumer debts and the purchase of consumer debts.

13.    Upon information and belief, Rempel resides at 23 Prairie Dunes Drive, Hutchinson, Kansas 67502.

14.    The Defendants are "*debt collectors*" within the meaning of the FDCPA, 15 U.S.C. § 1692a(6), and the FCCPA, Fla. Stat. § 559.55(7), in that the Defendants use an instrumentality of commerce, including the U.S. mail and / or telephone, interstate and within the state of Florida, for their business, the principal purpose of which is the collection of debts, and / or they regularly collect or attempt to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

15.    NCA is licensed to collect consumer debts in the State of Florida, as a Consumer Collection Agency ("**CCA**"), holding license number CCA0900486.

## FACTUAL ALLEGATIONS

### Rise and Continental Make Illegal Loans to Mr. Perry

16.     In or around February 2020, Elevate Credit, Inc., *doing business as* Rise Credit ("**Rise**"), issued an open-ended line of credit (the "**Rise Account**" or "**Rise Loan**") to Mr. Perry.

17.     The Rise Account had a stated credit limit of $5,000.

18.     The Rise Account was, purportedly, funded through FinWise**,** a small, single-branch bank in Murray, Utah.[1]

19.     Mr. Perry used the line of credit from the Rise Account for household expenses.

20.     In or around May 2017, Continental Finance Company ("**CFC**") issued an open-ended line of credit (the "**Surge Account**" or "**Surge Loan**") to Mr. Perry.

21.     The Surge Account was advertised as "Surge Mastercard."

22.     The Surge Account was, purportedly, funded through Celtic Bank.

23.     Mr. Perry used this line of credit for household expenses.

24.     Both the Rise Account and Surge Account (the "**Accounts**" or "**Loans**") arose from the purchase of goods and services which were primarily for family, personal, or household purposes, specifically charges for consumer goods and services, and therefore the accounts, and any balance arising therefrom, meet

---

[1] The bank has a small office in Sandy, UT and Garden City, NY, but has no retail branches at these locations.

the definition of *Debt* under the FDCPA, 15 U.S.C. § 1692a(5) and the FCCPA, Fla. Stat. § 559.55(6).

25.     Fla. Stat. § 687.071(2) renders loans made with annual interest rates greater than 25% a second-degree misdemeanor.

26.     Fla. Stat. § 687.071(3) renders loans made with annual interest rates greater than 45% a third-degree felony.

27.     Fla. Stat. § 687.071(7) renders any loan in violation of Fla. Stat. § 687.701, and any debt stemming from such extension of credit, void and unenforceable.

28.     The annual interest rate on the Rise Account exceeded 100% annually.

29.     The stated annual interest rate on the Surge Account exceeded 25% annually and had an effective interest rate of over 80% annually due to the application of other fees which Florida law consider interest.

30.     The Surge account had a stated credit limit of $800; however, the Account also had an $200 "annual fee" which Mr. Perry was required to pay, meaning that only $600 of credit was available to him.

31.     The $200 in fees Mr. Perry was required to pay to obtain the $800 line of credit is considered interest under Florida law. *See* Fla. Stat. 687.03 -- interest is computed including fees for "any contract, contrivance, or device whatever

whereby the debtor is required or obligated to pay a sum of money greater than the actual principal sum received."

32.     The principal sum received was a maximum of $600, for which Mr. Perry had to pay $800, which is an 57% annual interest rate; when adding the stated APR on the Surge account, the combined effective APR exceeds **80%**.

33.     The Accounts were thus both void *ab initio. See Stubblefield v. Dunlap*, 148 Fla. 401, 4 So.2d 519 (1941); *Pushee v. Johnson*, 123 Fla. 305, 166 So. 847 (1936); *River Hills, Inc. v. Edwards*, 190 So.2d 415 (Fla. 2d DCA 1966). *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935) (criminally usurious loans are "void as against the public policy of the state as established by its Legislature.")

34.     The Accounts are therefore "unlawful debts" per Fla. Sta. § 772.102(2).

35.     Florida law prohibits any recovery of the principal on such loans or extensions of credit. *Rollins v. Odom*, 519 So. 2d 652, 656 (Fla. Dist. Ct. App. 1988).


**Rise Engages in Rent-a-Bank Scheme with FinWise**

36.     Rise is a Fort Worth, Texas-based FinTech company, lending to consumers at interest rates illegal in the vast majority of states, including Florida.

37.     One of the founders of Rise was Ken Rees ("**Rees**") who was its CEO until his resignation in July 2019.

38.     Rees was previously the CEO of Think Finance, LLC ("**Think Finance**"), which made similar illegal consumer loans at triple-digit interest rates.

39.     Initially, Think Finance "partnered" with the First Bank of Delaware to launder its loans to create the appearance that they were issued by a state-chartered bank, to avoid state usury laws.

40.     In 2012, the First Bank of Delaware was stripped of its bank charter and fined $15 million.

41.     Rees thereafter partnered with the Chippewa Cree Tribe of the Rocky Boy's Indian Reservation in Box Elder, Montana and began laundering its loans – now re-branded "Plain Green Loans" – through the Tribe, claiming the Tribe's sovereign immunity prevented civil and criminal action from being taken against it.  Such arrangement is often referred to as a "rent-a-tribe" scheme.

42.     Plain Green's loans charged interest rates of up to 400% annually.

43.     After lawsuits filed against Think Finance by the Consumer Financial Protection Bureau, the Pennsylvania Attorney General, and others, relating to the wildly-usurious interest rates being charged by Plain Green, Rees formed Elevate Credit, Inc.

44.     Rise accounts carry interest rates between 99% and 149% annually. **SEE PLAINTIFF'S EXHIBIT A.**

45.     In an effort to avoid state usury laws, Rise "partnered" with FinWise.

46.     Purportedly, FinWise originates the loan, and then assigns the loan to Elevate, which "services" the loan.

47.     However, at no point is FinWise the true lender of the Rise loans, nor is any capital belonging to FinWise at risk.

48.     Such "rent-a-bank" schemes simply allow predatory lenders like Elevate d/b/a Rise to make loans to consumers in states which prohibit usury, including Florida, with a modicum of legal cover.

49.     Predatory lenders like Elevate use such agreements to attempt to avoid prosecution while they make illegal loans to consumers in states which prohibit usury, including Florida.

50.     FinWise, as a chartered bank, is not subject to state interest rate limits pursuant to the National Bank Act; it can export the maximum interest rate in its home state of Utah to lend to borrowers in other states with stricter usury laws. *See* 12 U.S.C. § 85.

51.     Conveniently, Utah allows the parties to a contract to agree on any interest rate, provided it is not unconscionable. Utah Statutes do prohibit unconscionable consumer lending and render any such loans void.  *See* UCA § 70C-7-106; *Sosa v. Paulos*, 924 P.2d 357, 359 (Utah 1996).[2]

---

[2] The notion that charging a person excessive rates to borrow money is unconscionable dates back to Biblical times (see, e.g., Prov. 28:8, Ex. 22:25, Deut. 23:19). Restrictions on usury also pre-date the founding of the United States. Virginia, for example, began restricting interest rates in 1730, as it believed excessive interest rates to be unconscionable.

52.     The rate charged by Rise was more than four times the rates charged by other Utah-based lenders (i.e., CapitalOne, based in Utah, which loaned money to Mr. Perry at rates under 25% annually), which also tends to establish the Rise loan was unconscionable since it charged fees more than 400% greater than the fair market rate charged by other lenders.

53.     Moreover, FinWise was not the true lender of Mr. Perry's purported Rise Account -- Rise only launders its loans through FinWise.

54.     Indeed, FinWise had virtually nothing to do with the marketing, underwriting, servicing, collection, and post-charge-off sale to Defendant NCA.

55.     Of particular importance, none of FinWise's capital was ever at risk under Rise's Account.

56.     In exchange for the use of its name, FinWise is paid a small portion of the loan for its role in Rise's lending.

57.     At all times relevant, Elevate EF SPV ("**EF SPV**"), a Cayman Islands special purpose vehicle which operates for the financial benefit of Elevate Credit, had purchased a 96% interest in the receivables for the loans, including principal and interest due.

58.     This 96% ownership interest shows that EF SPV is the legal and equitable owner of the receivables for the loans.

59.     Elevate Credit is the primary beneficiary of EF SPV, and receives the income generated from this 96% ownership interest.

60.     Elevate Credit substantially controls and manages EF SPV and absorbs any losses, insulating EF SPV and FinWise.

61.     Elevate Credit is the entity whose capital is at risk if a particular consumer loan goes bad.

62.     FinWise contributes, at most, a token 4% of the capital of any consumer loan.

63.     Thus, on information and belief, FinWise contributed $200 or less to fund Ms. Dempsey's loan, while Elevate Credit contributed $4,800 or more.

64.     Elevate Credit protects EF SPV from Rise loan losses, placing the risk of loss on Elevate Credit.

65.     Similarly, FinWise's economic interests are protected due to its agreement with Elevate Credit, which includes a stipulation that EF SPV maintain cash collateral in a FinWise account to secure its obligations to purchase the Rise loans allegedly made "by" FinWise.

66.     Elevate Credit, through ones of its subsidiaries, acts as the servicer for the Rise loans, not FinWise.

67.     Similarly, Elevate Credit reconciles the accounts, posts payments and other credits to the accounts, and provides periodic billing statements to consumers.

68.     Elevate Credit, not FinWise, has the predominant economic interest in loans made to consumers like Mr. Perry, and is thus the true lender of the loans.

69.     As per Rise's business model, once FinWise made the Loan to Mr. Perry, it was immediately assigned to Rise.

70.     Rise, not FinWise, then proceeded to attempt to collect the Rise Loan – including the usurious interest – from Mr. Perry.

71.      However, Rise, a non-bank assignee of the Rise Loan, had no legal ability to collect the assessed interest.

72.     Rise has been sued in the past for collection of unlawful debt and its use of FinWise in its "rent-a-bank" schemes.

73.     Rise thus knew, or should have known, that it had no legal authority to collect the Rise Loan from Mr. Perry.

### Continental's Rent-a-Bank Scheme with Celtic Bank

74.     The Surge® Mastercard is a registered trademark of Continental Finance, LLC ("**Continental**"). *See* https://www.surgecardinfo.com/about.html.

75.     In the frequently asked questions section on Continental's website, it describes itself as, "one of America's leading marketers and servicers of credit

cards for consumers with less-than-perfect credit." **SEE PLAINTIFF'S EXHIBIT B.**

76.     Continental provides consumer financing options to deep sub-prime consumers, at interest rates illegal in the vast majority of states, including Florida.

77.     All of these accounts carry interest rates between 24.9% and 29.9% annually.

78.     Continental is not a bank, nor does it hold any lending licenses in Florida.

79.     Like Rise, Continental seeks to avoid state usury laws by engaging in "rent-a-bank" schemes with several different small banks.

80.      Continental "partners" with Celtic Bank, a small Utah bank founded in 2001 to provide primary and secondary commercial and real estate lending.

81.     Celtic Bank does little consumer lending of its own, and issues no credit card accounts of its own, *sans* "partner."

82.     Continental "laundered" its extensions of credit through Celtic Bank, claiming that Celtic Bank was the true entity extending credit.

83.     However, Celtic Bank was not the true entity extending credit to Mr. Perry, and had virtually nothing to do with the application process, underwriting, marketing, servicing, or collection of Mr. Perry's account.

84.     Similar to FinWise and Rise, at no point was any of Celtic Bank's own capital at risk if  Mr. Perry defaulted.

85.     Surge Mastercard underwriting is performed by Continental, based upon criteria selected by Continental – not Celtic Bank.

86.     The overwhelming majority of money utilized to fund consumer purchases made to Surge Mastercard accounts comes from Continental, or investors of Continental, and not Celtic Bank.

87.     Further, through a series of interrelated entities and shell companies, Continental indemnifies Celtic Bank from any loss, and guarantees Celtic Bank a profit.

88.     Celtic Bank contributed less than 5% of the capital to fund purchases made to Surge Mastercards.

89.     Continental reported Mr. Perry's account to several major Credit Reporting Agencies ("**CRAs**"), including Experian. **SEE PLAINTIFF'S EXHIBIT C.**

90.     Continental's tradeline concerning the account listed its own Wilmington, Delaware address. *Id.*

91.     Continental, not Celtic Bank, sold portfolios of charged-off consumer debt to third-party debt purchasers, including the portfolio containing Mr. Perry's charged-off receivable.

92.     As such, Continental, and not Celtic Bank, held the predominate economic interest in Mr. Perry's account and was the true lender.

### NCA Attempts to Collect Usurious Loans from Mr. Perry

93.     Mr. Perry fell behind on payments on the Surge Account in or around June 2018.

94.     By December 2018, Continental claimed Mr. Perry owed $1,183 on an $800 credit limit.

95.     By December 2020, Rise claimed Mr. Perry owed $6,170 on a $5,000 credit limit.

96.     Around December 2020, Rise sold the Rise Account to NCA.

97.     Around December 2018, Continental sold the Surge Account to a New York-based debt buyer, DNF Associates.

98.     At some point after this DNF Associates, or some other unknown successor-in-interest, sold or otherwise assigned the Surge Account to NCA.

99.     NCA, pursuant to 15 U.S.C. § 1692g, thereafter mailed Mr. Perry collection letters, seeking to collect the Accounts.

100.    NCA also reported the purported "debts" to the major CRAs, including Experian, monthly, beginning February 2021 and May 2021. **SEE PLAINTIFF'S EXHIBITS D & E.**

101.   Reporting a debt to a CRA is an attempt to collect the debt alleged therein. *See, e.g., Edeh v. Midland Credit Management, Inc.,* 748 F. Supp. 2d 1030 (D. Minn. 2010) ("The Court has learned, through its work on countless FDCPA cases, that threatening to report and reporting debts to CRAs is one of the most commonly-used arrows in the debt collector's quiver.")

102.   NCA certified to the CRAs that the debts it was reporting as "in collection," with $6,229 and $1,183 past due, indicated that both the Rise Account and the Surge Account were legitimate, lawful debts.

103.   As aforementioned, NCA reported the Rise Account had a past due amount of $6,229.

104.   However, Rise reported to the CRAs that Mr. Perry owed $6,170. **SEE PLAINTIFF'S EXHIBIT E.**

105.   NCA appears to have assessed a post-charge-off fee in the amount of $59. **SEE PLAINTIFF'S EXHIBIT C**.

106.   On information and belief, NCA profits from the additional fees, since it attempts to collect the principal balance in addition to the fees it assesses in excess of the principal amount owed.

107.   NCA knew, or should have known, that it was collecting illegal debts from Mr. Perry.

108.   NCA is a large debt buyer with a number of experienced lawyers advising it on consumer protection statutes.

109.   Further, NCA has been subject to multiple actions by state regulatory authorities over its attempts to collect on illegally-issued consumer loans.

110.   For example, NCA was sued in July 2012 by the Arkansas State Attorney General for collecting payday loans issued to Arkansas consumers in violation of Arkansas law. As part of its settlement with the Attorney General, NCA cancelled collection on $2.7 million in loans, and paid $200,000 to the State.

111.   Over 100 lawsuits have been filed against NCA for its collection of consumer loans made under illegal terms.

112.   NCA was in possession of the original loan agreement documents creating the Accounts.

113.   On information and belief, the usurious interest rate was printed in large, bold type on the Truth in Lending Act ("TILA") disclosure.

114.   Mr. Perry suffered severe emotional distress in being subjected to illegal collection actions over loans by NCA which he, pursuant to Florida law, does not owe.

115.   Mr. Perry's credit reports and scores have been severely and adversely impacted from NCA's false reporting that he legitimately owes a debt in excess of $7,412 to NCA.

116.   At all times relevant, Rempel, as CEO of NCA, instructed his agents and employees to attempt to collect the Accounts from Mr. Perry.

117.   At all times relevant, Rempel, as CEO of NCA, authorized the purchase of bulk portfolios of debt from lenders including Rise and Continental, despite knowing the loans had been made at usurious interest rates through dubious "rent-a-bank" schemes.

118.   Remple, in his capacity as CEO of NCA, was responsible for implementing NCA's aforementioned collection policies.

119.   Remple is jointly and severally liable for the actions of NCA and its agents taken pursuant to the policies he put in place and had authority to control. *See Fed. Trade Comm'n v. Primary Grp., Inc.,* No. 16-13532, at *3 n.2 (11th Cir. Sep. 29, 2017).

120.   Mr. Perry has hired the aforementioned law firm to represent him in this matter and has assigned his right to fees and costs to such firm.

### COUNT I
### VIOLATIONS OF THE FDCPA
### 15 U.S.C. § 1692e

121.   Mr. Perry adopts and incorporates paragraphs 1 – 120 as if fully stated herein.

122.   The Defendants violated **15 U.S.C. § 1692e** when NCA used misleading and deceptive means to attempt to collect a debt by attempting to

collect the Accounts from Mr. Perry, a Florida resident, both in writing and via credit reporting, claiming Debts from unlicensed, non-bank entities, Rise and Continental, both bearing annual interest exceeding 80%, were legal, valid, and enforceable debts, when the Accounts were null, void, and unenforceable under Florida law, and added a $59 fee to the Rise Account, when no contract authorizing such fees existed.

123.   The above stated violations were committed pursuant to policies put in place by Rempel and subject to his day-to-day oversight.

124.   Rempel is therefore jointly and severally liable with NCA. *See Fed. Trade Comm'n v. Moses*, 913 F.3d 297 (2d Cir. 2019).

125.   The Defendants' conduct renders them liable for the above-stated violations of the FDCPA.

**WHEREFORE,** Mr. Perry respectfully requests that this Honorable Court enter judgment against NCA and Rempel, jointly and severally, for:

a.   Statutory damages of **$1,000.00**, pursuant to 15 U.S.C. § 1692k(a)(2)(A);

b.   Actual damages, pursuant to 15 U.S.C. § 1692k(a)(2)(A);

c.   Reasonable costs and attorneys' fees pursuant to 15 U.S.C. § 1692k(a)(3); and,

d.   Such other relief that this Court deems just and proper.

## COUNT II
## VIOLATIONS OF THE FDCPA
## 15 U.S.C. § 1692e(10)

126.   Mr. Perry adopts and incorporates paragraphs 1 – 120 as if fully stated herein.

127.   The Defendants violated **15 U.S.C. § 1692e(10)** when NCA used misleading and deceptive means to attempt to collect a debt by attempting to collect the Accounts from Mr. Perry, a Florida resident, both in writing and via credit reporting, claiming Accounts from unlicensed, non-bank entities, Rise and Continental, both bearing annual interest exceeding 80%, were legal, valid, and enforceable debts, when the Accounts were null, void, and unenforceable under Florida law and added a $59 fee to the Rise Account, when no contract authorizing such fees existed.

128.   The above stated violations were committed pursuant to policies put in place by Rempel and subject to his day-to-day oversight.

129.   Rempel is therefore jointly and severally liable with NCA. *See Fed. Trade Comm'n v. Moses*, 913 F.3d 297 (2d Cir. 2019).

130.   The Defendants' conduct renders them liable for the above-stated violations of the FDCPA.

**WHEREFORE,** Mr. Perry respectfully requests that this Honorable Court enter judgment against NCA and Rempel, jointly and severally, for:

a.    Statutory damages of **$1,000.00**, pursuant to 15 U.S.C. § 1692k(a)(2)(A);

b.    Actual damages, pursuant to 15 U.S.C. § 1692k(a)(2)(A);

c.    Reasonable costs and attorneys' fees pursuant to 15 U.S.C. § 1692k(a)(3); and,

d.    Such other relief that this Court deems just and proper.

<u>**COUNT III**</u>
<u>**VIOLATIONS OF THE FDCPA**</u>
<u>**15 U.S.C. § 1692e(2)(a)**</u>

131.  Mr. Perry adopts and incorporates paragraphs 1 – 120as if fully stated herein.

132.  The Defendants violated **15 U.S.C. § 1692e(2)(a)** when NCA made a false representation about the character, amount and/or legal status of a debt by attempting to collect from Mr. Perry, a Florida resident, both in writing and via credit reporting, Debts from unlicensed, non-bank entities, Rise and Continental, both bearing annual interest exceeding 80%, were legal, valid, and enforceable debts, when the Accounts were null, void, and unenforceable under Florida law and added a $59 fee to the Rise Account, when no contract authorizing such fees existed.

133.  The above stated violations were committed pursuant to policies put in place by Rempel and subject to his day-to-day oversight.

134. Rempel is therefore jointly and severally liable with NCA. *See Fed. Trade Comm'n v. Moses*, 913 F.3d 297 (2d Cir. 2019).

135. The Defendants' conduct renders them liable for the above-stated violations of the FDCPA.

**WHEREFORE,** Mr. Perry respectfully requests that this Honorable Court enter judgment against NCA and Rempel, jointly and severally, for:

a. Statutory damages of **$1,000.00**, pursuant to 15 U.S.C. § 1692k(a)(2)(A);

b. Actual damages, pursuant to 15 U.S.C. § 1692k(a)(2)(A);

c. Reasonable costs and attorneys' fees pursuant to 15 U.S.C. § 1692k(a)(3); and,

d. Such other relief that this Court deems just and proper.

## COUNT IV
## VIOLATIONS OF THE FDCPA
## 15 U.S.C. § 1692e(8)

136. Mr. Perry adopts and incorporates paragraphs 1 – 120 as if fully stated herein.

137. The Defendants violated **15 U.S.C. § 1692e(8)** when NCA communicated credit information which was false, and which NCA knew, or should have known was false, to wit, that Debts from unlicensed, non-bank entities, Rise and Continental, bearing annual interest exceeding 80%, were legal,

valid, and enforceable debts, and that Mr. Perry thus actually owed the $6,229 and $1,183 balances, when he did not owe them as they were null, void and unenforceable against him pursuant to Florida law.

138.   The Defendants violated 15 U.S.C. § 1692e(8) when it communicated credit information which was false when they added a $59 fee to the Rise Account, when no contract authorizing such fees existed.

139.   The above stated violations were committed pursuant to policies put in place by Rempel and subject to his day-to-day oversight.

140.   Rempel is therefore jointly and severally liable with NCA. *See Fed. Trade Comm'n v. Moses*, 913 F.3d 297 (2d Cir. 2019).

141.   The Defendants' conduct renders them liable for the above-stated violations of the FDCPA.

**WHEREFORE,** Mr. Perry respectfully requests that this Honorable Court enter judgment against NCA and Rempel, jointly and severally, for:

a.   Statutory damages of **$1,000.00**, pursuant to 15 U.S.C. § 1692k(a)(2)(A);

b.   Actual damages, pursuant to 15 U.S.C. § 1692k(a)(2)(A);

c.   Reasonable costs and attorneys' fees pursuant to 15 U.S.C. § 1692k(a)(3); and,

d.   Such other relief that this Court deems just and proper.

## COUNT V
## VIOLATIONS OF THE FDCPA
## 15 U.S.C. § 1692f(1)

142.    Mr. Perry adopts and incorporates paragraphs 1 – 120 as if fully stated herein.

143.    The Defendants violated **15 U.S.C. § 1692f(1)** when NCA attempted to collect an amount not authorized by contract or law – to wit, the entire purported Rise and Surge Accounts-- from Mr. Perry through written demands and credit reporting, when the Accounts were null, void, and unenforceable under Florida law and added a $59 fee to the Rise Account, when no contract authorizing such fees existed.

144.    The above stated violations were committed pursuant to policies put in place by Rempel and subject to his day-to-day oversight.

145.    Rempel is therefore jointly and severally liable with NCA. *See Fed. Trade Comm'n v. Moses*, 913 F.3d 297 (2d Cir. 2019).

146.    The Defendants' conduct renders them liable for the above-stated violations of the FDCPA.

**WHEREFORE,** Mr. Perry respectfully requests that this Honorable Court enter judgment against NCA and Rempel, jointly and severally, for:

a.    Statutory damages of **$1,000.00**, pursuant to 15 U.S.C. § 1692k(a)(2)(A);

b. Actual damages, pursuant to 15 U.S.C. § 1692k(a)(2)(A);

c. Reasonable costs and attorneys' fees pursuant to 15 U.S.C. § 1692k(a)(3); and,

d. Such other relief that this Court deems just and proper.

### COUNT VI
### VIOLATIONS OF THE FDCPA
### 15 U.S.C. § 1692g(1)

147. Mr. Perry adopts and incorporates paragraphs 1 – 120 as if fully stated herein.

148. The Defendants violated 15 U.S.C. § 1692g(1) when it failed to provide accurate notice of the amount of the Rise Account, claiming the amount was $6170 plus an additional $59 fee, albeit an unlawful debt.

149. The above stated violations were committed pursuant to policies put in place by Rempel and subject to his day-to-day oversight.

150. Rempel is therefore jointly and severally liable with NCA. *See Fed. Trade Comm'n v. Moses*, 913 F.3d 297 (2d Cir. 2019).

151. The Defendants' conduct renders them liable for the above-stated violations of the FDCPA.

**WHEREFORE,** Mr. Perry respectfully requests that this Honorable Court enter judgment against NCA and Rempel, jointly and severally, for:

a.  Statutory damages of **$1,000.00**, pursuant to 15 U.S.C. § 1692k(a)(2)(A);

b.  Actual damages, pursuant to 15 U.S.C. § 1692k(a)(2)(A);

c.  Reasonable costs and attorneys' fees pursuant to 15 U.S.C. § 1692k(a)(3); and,

d.  Such other relief that this Court deems just and proper.

## COUNT VII
## VIOLATIONS OF THE FCCPA
## FLA. STAT. 559.72(9)

152.  Mr. Perry adopts and incorporates paragraphs 1 – 120 as if fully stated herein.

153.  The Defendants violated **Fla. Stat. § 559.72(9)**, when NCA attempted to collect the Accounts from Mr. Perry via multiple collection letters mailed to him, thereby asserting the legal right to collect the Accounts, when the Accounts were illegitimate and unenforceable due to the application of interest rates in excess of 80% percent annually, and NCA knew, or should have known, that the Accounts were unenforceable in Florida and that no legal right to collect them existed.

154.  NCA was in possession of the original loan documents and thus knew, or should have known, that the Accounts contained an illegal interest rate in Florida.

155.   The above stated violations were committed pursuant to policies put in place by Rempel and subject to his day-to-day oversight.

156.   Rempel is therefore jointly and severally liable with NCA. *See Fed. Trade Comm'n v. Moses*, 913 F.3d 297 (2d Cir. 2019).

**WHEREFORE,** Mr. Perry respectfully requests this Honorable Court enter judgment against NCA and Rempel, jointly and severally, for:

a.   Statutory damages of **$1,000.00** pursuant to Section 559.77(2), Fla. Stat.;

b.   Actual damages pursuant to Section 559.77(2), Fla. Stat.;

c.   Injunctive relief preventing NCA from attempting to collect the alleged Loans from Mr. Perry pursuant to Section 559.77(2), Fla. Stat.;

d.   Reasonable costs and attorney's fees pursuant to pursuant to Section 559.77(2), Fla. Stat.; and,

e.   Such other relief that this Court deems just and proper.

## COUNT VIII
## VIOLATIONS OF THE CRCPA
## FLA. STAT. § 772.103(3)

157.   Mr. Roper adopts and incorporates paragraphs 1 – 120 as if fully stated herein.

158.   The Defendants violated **Fla. Stat. § 772.103(4),** when they conspired with Rise and Continental to collect an unlawful debt - the Rise Account and Surge Account.

159.   The Defendants took action in furtherance of this conspiracy, including mailing collection letters and reporting the Accounts to the nationwide CRAs as purported unpaid debts, damaging Mr. Perry's credit and, in effect, holding his credit report hostage until he paid the unlawful debts.

160.   The Defendants have attempted to collect virtually-identical debts through credit reporting, phone calls, demand letters, and threats of litigation from hundreds, if not thousands, of other Florida residents.

**WHEREFORE,** Mr. Perry respectfully requests this Honorable Court enter judgment against NCA and Rempel, jointly and severally, ordering:

a.   Threefold the amount of actual damages or, in the alternate, the statutory minimum of **$200**, whichever is greater, pursuant to Florida Statute 772.104(1);

b.   Reasonable costs and attorneys' fees pursuant to pursuant to Florida Statute 772.104(1);

c.   An injunction of Estoppel against NCA from engaging in any further action in violation of Florida law, pursuant to Florida Statute 772.14; and,

d.   Any other relief this Court deems equitable and proper under the circumstances.

<u>**COUNT IX**</u>

## <u>VIOLATIONS OF RICO</u>
## <u>18 U.S.C. § 1962(c)</u>

161.   Mr. Perry hereby incorporates paragraphs 1 –120 as if fully stated herein.

162.   NCA and Rempel, together with Rise and Continental, through their efforts to collect the Accounts on behalf of Rise and Continental, constitute an "enterprise" under RICO, 18 U.S.C. § 1961(4).

163.   The Accounts issued by Rise and Continental to Plaintiff charged interest rates far in excess of twice the enforceable rate under Florida law and, thus, the Accounts constitute *unlawful debts* under RICO, 18 U.S.C. § 1961(6).

164.   The Defendants utilized the internet, telephone and mail to reach across state lines in the operation of NCA, including through collection calls, and credit reporting.

165.   The Defendants each associated with the enterprise and participated in the affairs of the enterprise through the collection of a unlawful debts – the Accounts.

166.   The Defendants' participation in the enterprise affected interstate lending / commerce, and violated § 1962(c) of RICO by causing Plaintiff to repay unlawful loans.

167.   The above stated violations were committed pursuant to policies put in place by Rempel and subject to his day-to-day oversight.

168.   Rempel is therefore jointly and severally liable with NCA. *See Fed. Trade Comm'n v. Moses*, 913 F.3d 297 (2d Cir. 2019).

169.   Accordingly, the Defendants are jointly and severally liable to Plaintiff for his actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

**COUNT X**
**VIOLATIONS OF RICO**
**18 U.S.C. § 1962(d)**

170.   Mr. Perry hereby incorporates paragraphs 1 – 120 as if fully stated herein.

171.   The Accounts issued by Rise and Continental to Plaintiff charged interest rates far in excess of twice the enforceable rate under Florida law and, thus, the Accounts constitute *unlawful debts* under RICO, 18 U.S.C. § 1961(6).

172.   The Defendants utilized the internet, telephone and mail to reach across state lines in the operation of NCA, including making collection calls, and credit reporting.

173.   The Defendants violated **§ 1962(d) of RICO** by conspiring with Rise and Continental, and other persons, to issue and collect Plaintiff's unlawful

Accounts and other similar illegal loans in the form of a joint enterprise between Rise and Continental.

174.    The Defendants acted in furtherance of this conspiracy, by attempting to collect the Accounts through credit reporting, calls, and emails to Plaintiff.

175.    The above stated violations were committed pursuant to policies put in place by Rempel and subject to his day-to-day oversight.

176.    Rempel is therefore jointly and severally liable with NCA. *See Fed. Trade Comm'n v. Moses*, 913 F.3d 297 (2d Cir. 2019).

177.    Accordingly, the Defendants are jointly and severally liable to Plaintiff for treble actual damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

## DEMAND FOR JURY TRIAL

Mr. Perry hereby demands a trial by jury on all issues so triable.


Respectfully submitted on March 15, 2022, by:



**SERAPH LEGAL, P. A.**

*/s/Thomas M. Bonan*
Thomas M. Bonan, Esq.
Florida Bar No.:118103
TBonan@SeraphLegal.Com

Seraph Legal, P.A.

1614 North 19th Street
Tampa, FL 33605
Tel: 813-567-1230 (Ext: 304)
Fax: 855-500-0705
*Counsel for Plaintiff*

## ATTACHED EXHIBIT LIST

A     Rise's Terms & Conditions – Excerpt
B     Continental's FAQ's - Excerpt
C     Mr. Perry's Experian Consumer Disclosure, February 23, 2022, Surge Account - Excerpt
D     Mr. Perry's Experian Consumer Disclosure, February 23, 2022, NCA Tradeline (Rise Account) - Excerpt
E     Mr. Perry's Experian Consumer Disclosure, February 23, 2022, NCA Tradeline (Surge Account) – Excerpt
F     Mr. Perry's Experian Consumer Disclosure, February 23, 2022, Rise Account - Excerpt